23-3640 United States of America v. Jaylan Gore Argument not to exceed 15 minutes per side. Mr. Yaisel, you may proceed for the appellate. Good morning, Your Honors. Keith Yaisel. I represent the appellate Jaylan Gore. I have reserved two minutes of rebuttal. If it pleases the Court, Learned Counsel, this case is about the faithful application of Bruin. I realize that I raised this issue in the District Court two weeks after Bruin was decided. I don't have a lot to go on because all I know is that everything I've read, and I read these cases every day, is all over the place. But I think that the first step is where we're having a lot of problems. It's mostly coming from the government, not the judges, because they get it, just like Judge Morrison got it. Mr. Gore is entitled to the presumption that this statute is presumably unconstitutional. Therefore, she focused on the second step, because there's really three steps in the first step, or three things you've got to look at. Gore's status, he's a citizen. Gore's weapon, well, that's an arm within the meaning of the Constitution in terms of the Second Amendment. The third one really is, what's the purpose for having the gun? And we don't know that because Mr. Gore didn't testify at trial, but presumably it was looking at the weapon for purposes of self-defense because he was interested in buying it and somebody was trying to sell it to him. It had the status of being a stolen weapon. So, as the judge found below, Mr. Gore's conduct is presumptively protected. Now, Bruin rejected the means and scrutiny that had been going on in most of the circuits for really since even before Heller. And now you've just got to do two things. You've got to make a historical inquiry and that looks into the how and the why. How does this regulation burden the Second Amendment rights? And second, why are the government's examples, not the court's examples, the government's examples comparable? In this case, I don't think they met that burden. What I'm going to point out is, I'm going to focus here first on the fact that he was under indictment in state court. Even though you're under indictment in state court, you still have your presumption of innocence. But for some reason Congress decided to eliminate that, even though that has not been around that long. In fact, it's only really been around... I'm sorry, what has only been around? The presumption of innocence? Congress's determination that you're not going to have a gun if you're under indictment. That's not what 922N actually says. It doesn't dispossess you of your weapons. It just says you can't get new weapons. That's right. What if you don't have a weapon? Right, but what if you do? So you only made a facial challenge here. Correct. So that means a facial challenge would mean that there is no application of this law. This law couldn't apply to anybody in a way that would be constitutional. So let's say that there is a person who has an armory, every kind of weapon available for self-defense, and just wants a new one, like an update, the newest model of the gun he already has. And he's under indictment, the 922N would forbid him from buying the newer model. But he's got the old model, the old model functions, and he's got 10 others, 20 others besides. Is it your position that 922N can't apply constitutionally to that person? I don't think 922N should apply to anyone because it undermines the presumption of innocence, number one, because it's a blanket prohibition. It's a blanket prohibition, right, on acquiring new weapons. In that, and this is where I'm saying it's a blanket prohibition as opposed to one another. Congress never gave Mr. Gore an opportunity to be heard. Congress didn't give him due process. There was no individualized basis for determining this particular person under this particular indictment is in fact dangerous and should not have a firearm. So is it your position that the Second Amendment forbids any manner of blanket determinations? So all the 922 laws, any presumption. So let's say it was we're going to dispossess people indicted for armed robbery or convicted of armed robbery or committed of murder. Your position is those would all be unconstitutional because the murderer would need an individualized determination that he's not dangerous? Is he a murderer? Is he a voluntary manslaughter person? What was it? So I understand what this law does. I'm just asking is it your contention that Congress can't make any blanket rules? It must always afford individualized determination even if it's unconstitutional. So what Congress can do is Congress can one, make sure it doesn't violate step one of Bruin at all. Well, even what if we give you step one and say, sure, Mr. Gore is a citizen and therefore he's part of the people. And so let's talk about step two. If I concede step one to you, let's just talk about step two. Is it your position that Congress under step two can make no blanket determinations, must always have an individualized determination? No. What they have to do is they have to, number one, how does this burden your Second Amendment right? And in this case, as you pointed out, it doesn't bar him from any weapons he already has in his armory, if any, but it does in fact stop from obtaining new weapons. And that's only for the period while you're under indictment. Right. Now, there's a corollary to that in our law, which is the Bail Reform Act, where the judge is... I'm sorry, Your Honor, the Bail Reform Act. And I argued that below, and I argued that again a little bit in the brief, and of course they're bringing that matter up in their latest filing concerning additional citation of authority. And the point I'm going to make is, Bail Reform Act, I'm in front of a magistrate or a judge, and they're making an individualized determination as to whether or not this person in this situation can have a firearm. Isn't that a separate issue from the right to bear arms? There are constitutional provisions protecting the right to bail, too. But here we're talking about whether the laws and historical precedent could have in fact done something by a categorical determination. Doesn't the briefing show you that in fact historically there were considerations in categorical methods as what we would say here, they're fair proxies for dangerousness. There were surety laws. There were other laws that were looking to establish a group of people who could not possess because they are dangerous in ways that society at that historic time found to be sufficiently dangerous that they needed to be controlled. So why doesn't that same concept apply here? First of all, Bruin rejects surety laws. Second of all, surety laws do take into account individualized findings of dangerousness. I mean, we still have a law in the books in the state of Ohio that's called a peace bond, where you cause problems, they can drag you into court and make you put up money, and you're going to lose that money if you go and mess up in the pizza shop or something or the bar. And that's the type of surety law. But it didn't bar the surety holders were never barred from obtaining new weapons. They were barred until they met the surety. Once they met the surety, all bets were off. The same thing is true with the ones about Catholics, blacks, Indians. So what do we do with the fact that at the founding most felonies were capital offenses? No capital defendant was admitted to bail. If you're being detained, you're obviously dispossessed of your weapons for the period between indictment and trial, either conviction or acquittal. So what do you do with that as a historical analog? It seems to me like there's an argument that Congress thought all felons could be dispossessed by virtue of being detained during the all indicted felons, not convicted felons. Well, if you go back to the 1791 era, it was capital people only. But capital, yes, true. But capital was a much broader concept then than now, right? All felonies are capital offenses at the founding. That's roughly true. Essentially any common law offense was a felony offense. You're either going to die or transportation. Right. So how, doesn't that work against you? I don't think it does because Congress changed that law, changed those bail laws as it moved past the founding period. And they changed those bail laws and they changed the degree of felony laws. So now, for instance, it's unconstitutional to execute a rapist. Right, I understand that, but Bruin asks us to look not at the modern state of the law, but at the state of the law at the time of the founding. Yes. For a historical analog. Might I ask you in your time remaining if you would address the Batson issue? Well, Your Honors, in the entire history of the state of Ohio, I believe because she had school issues with picking up her kids. And we all agreed, hey, that's probably a good idea, let her go. Because we might not be done in time for her to go pick her kids up. Even though we did have a verdict at 345 the same day. I'm just going to point out that's what happened. The second person is a 19-year-old young black male, has a job, high school graduate, going to college in the Ohio National Guard. The United States Attorney at the time, he's no longer with the office by the way, he moved on to private practice, he said, hey, all I've looked at is the standard jury questionnaire that they use here in the Southern District of Ohio in Cincinnati. It's the same one for every courthouse. He looked at it and he starts talking about things like lack of life experience and things like that. That seems to me to be a proxy for discrimination. And age seems to me to be a proxy for discrimination. And that's why I raise this issue. Because this is the only person of color left in the vinery. And I've been in that courthouse in a trial where I had 119 jurors called for jury duty. Not one person in the courtroom except my client was black. That's how bad it is. So you made the proper objection. And then what steps forward do you think were inadequately undertaken by the court or what decision do you think was in error? I think the judge didn't really look at the United States Attorney's proffered reasons deeply. She did point out to him, as we all did, that wait a minute, there's nothing in these questionnaires about number one, renting cars, or two, necessarily owning property or things. He was all concerned about whether or not he could understand the difference between possession, actual possession and constructive possession. That's what he was all worried about. Because this entire case was a constructive possession case. So that's what I saw happening. And it seems to me a high school graduate can grasp those concepts. They're given the jury instructions orally. They're given a copy in the back. They can read them over and over. They can sort of figure it out. Everybody's closing arguments really focused on the possession issue. And I think that that was not a concept that was difficult. So is there a particular case that you would rely on to say that the court erred in allowing this juror to be struck? No, there's not a particular case, Judge. It just bothers me that you sit there and you see persons of color struck. Because frankly, the Southern District of Ohio, Columbus is the place that has the least amount of and the largest area in the state. I think your time is up. Judge Gilman, do you have anything further? No. Okay. Thank you. You'll have your rebuttal time. Your Honor, I didn't hear anything from him. I think he said no. We may need you to turn up your microphone, Judge Gilman. I hear you. Great. We can hear you. Thank you. Let's switch to the next timing chart, please. Thank you. Good morning, Your Honors, and may it please the Court. Charles McLeod for the United States. Unless the Court has questions on the other issues in this case, I'd like to focus my time on the Section 922N issue, and I'll start by clarifying our position. Before you jump to that, I would like to hear your explanation of the Batson Challenge. Yes, Your Honor. I find that a concerning case that someone is young enough to serve, old enough to be in the military, has educational background, and the response is that he's too young to sit on a jury. That, to me, leaves an indication that there may be something else that is concerned. Your Honor, I don't think that was quite the prosecutor's response. He was not saying that people of that age are categorically ineligible or unqualified to serve on juries. Instead, he was saying that amongst the members of the jury pool, he would prefer someone who was a little bit older and had a little bit more life experience. And the District Court credited that explanation. The District Court did question the prosecution for its rationale, and the prosecutor gave an explanation saying that he believed in a case involving potentially complicated issues of possession, that someone who had a little bit more life experience would be a better fit for the jury. And there are cases... If that prosecutor had follow-up with questions, the juror still would have been 20 years old, and the answers likely would have revealed that that juror had less life experience than someone who was older. To Your Honor's earlier question to my colleague about whether there are comparator cases, I really don't think there is a comparator here. The cases that Appellant cited in his brief involve two scenarios that are not present here. One is a pattern of strikes on the part of the prosecution where multiple jurors of the same race are struck. That obviously didn't happen here. There was one African-American juror who was struck for cause, but there was not a pattern to the prosecution's peremptory strikes. The other feature of the cases that Appellant cited is that there are comparators who are similarly situated. So, for example, in the O'Donnell case that was cited in Appellant's opening brief, there was a white juror who had served on the same earlier jury as the black juror that the prosecution struck. And so that was an obvious case of a comparator who had the same supposed disability, but was allowed to serve. Do you think the standard is you're only in violation if your objection is silly or improvident? I think the standard is pretext. And in the passage that Your Honor is referring to, the district court listed silly, superstitious, improvident, and then said or otherwise pretextual. So I think the district court clearly understood the correct legal standard was pretext, and the court found there was no pretext, and we believe that's not clearly erroneous on this record, Your Honor. If I may turn to the 922 in issue, I'll start by clarifying our position on the way that Bruin's first step works, and then turn to the historical issue at Bruin Step 2. Mr. Easel suggested that we are arguing that Mr. Gore is not part of the people. That is not our position. We acknowledge that in Heller and Bruin, the Supreme Court defined the people as members of the political community, and we acknowledge that individuals who are under indictment and have not yet been convicted remain part of the political community. The argument that we have made at Step 1 is that Mr. Gore's particular conduct, that is conduct of possessing a stolen firearm that he knew to be stolen while under indictment is not within the scope of the Second Amendment. However, setting that aside and focusing just on the second step, we think that the history strongly supports the sort of... I'm sorry. Just so I understand this, so you're wrapping the possession of the stolen firearm, which is the other section, 922J, in with the 922N? So in other words, if the firearm... If he hadn't also been indicted for 922J, you would have a different argument on 922N? If the firearm was not stolen, we would have a different argument, and our argument on that... He's only been indicted on the stolen firearm Part 2. He hasn't been convicted of that. That's correct, Your Honor. But we're drawing from Bruin, which says you have to focus on the particular conduct that the defendant or individual wishes to engage in, and also this court's recent Oakland tactical decision, which suggests that you need a fairly specific definition of the conduct at Step 1. So we do think that the fact that the firearm was stolen is relevant at Step 1. However, we're happy to turn to the historical evidence at Step 2, and as Your Honor suggested, part of the original meaning of the Second Amendment is the ability of Congress and legislatures to make categorical judgments. And here we think one of the categorical judgments that Congress has made is that individuals who are under indictment for a serious crime, a crime punishable by felony level sentencing, are more likely to be dangerous with firearms than an ordinary citizen. And the Supreme Court has sort of shorthanded this idea by referring to the concept of the law abiding responsible citizen. We think this case implicates the not responsible portion of that standard. And what we understand history and tradition to teach is that someone is not responsible for purposes of the Second Amendment if their possession of a firearm poses a risk of harm that is greater than the risk posed by an ordinary citizen. And there are many ways in which that principle shows up throughout our history. Historically there were laws that barred children, vagrants, loyalists, other individuals who were believed to be dangerous from possessing firearms. And we think that that category of dangerousness is one of the relevant categories here. If we were to go down that road, wouldn't we also necessarily be saying that anyone under indictment could be entirely dispossessed? I mean, 922N is narrower than that, right? Because it's just, you can't get new guns. You can keep your old ones. Do we need to buy? First of all, is that the logical implication of your argument? And secondly, do we need to go that far? I think that is the implication of our argument and of the history. I think there is a strong tradition that suggests that if you're under indictment for a serious crime, you could be imprisoned at the founding. You could be denied bail. And that necessarily operates as a restriction on your ability to possess weapons. So I do think the implication of our argument is Congress could have gone further. Congress didn't go that far, as Your Honor has pointed out. But the Court doesn't need to reach that question in this case because, again, this is a facial challenge. So the question is simply, are there circumstances where this law could be constitutionally applied? And we think there are a range of circumstances, including the circumstances of this very case, where Mr. Gore's conduct was not only possessing a weapon, but possessing a weapon he knew to be stolen while under indictment. Yeah. What's your best, so you talk, you seem to lean pretty heavily on the surety laws rather than on the fact that felons were routinely detained at the founding. And I'm wondering why you, like, if you think the surety laws are your stronger argument? And if so, why? Because they seem kind of different to me for two reasons. One, that Bruin questions the surety laws because there's no history of enforcement that was identified there. So you could speak to that. And also that the surety laws ultimately allowed you to possess the gun as long as you paid the bond. So maybe you want to say we're not resting on surety, or maybe you want to explain to me why surety works. Maybe I could do both, Your Honor. So we are not resting exclusively on the surety laws. We think that they are a relevant part of the history. And what Bruin teaches us to do is to look at the history as a whole, a variety of different strands of history, and identify the enduring constitutional principles that define and delimit the Second Amendment. And we think surety laws are a relevant part of that. I acknowledge that surety laws operate differently than 922N does, but Bruin says that our burden is not to come forward with a swine or with a dead ringer for the modern regulation. We think what's relevant about the surety laws is that they imposed a temporary restriction on the ability to bear arms based on a concern about dangerousness, and that's exactly what 922N does. Again, I acknowledge the mechanics of how they imposed that disability were different, and I acknowledge that the record of enforcement is a little weaker compared to the history, the very strong history of enforcement against individuals who were charged with felony level crimes or serious crimes at the founding. We have a strong tradition of denying those individuals bail. And even when they were released, they were released subject to the power of sureties, who had essentially all-encompassing legal authority over their person. They could seize them up, they could deliver them to the authorities, they could break into their homes. They had a range of rights that would have necessarily included rights over their ability to possess firearms. So Mr. Gore thinks that it's relevant, very relevant, that there's no individualized finding of dangerousness. And he kind of has a point, because if you're indicted, you will be brought before a magistrate under the Bail Reform Act, and there are certain categories that Congress has carved out for which we need to have a finding of dangerousness. So there is this opportunity for an individualized determination, yet Congress has determined not to take advantage of that. Can you speak to that? Like why is it okay for Congress, consistent with the Second Amendment, to have not required individualization? Certainly. So I do want to push back a little bit on the characterization that there's no individualization here. There was individualized finding at the indictment stage. A grand jury returned an indictment against Mr. Gore, and that conclusively establishes probable cause to believe that he committed the offense. So this is not a law that applies to the people generally. Sure, but it's an indictee for any offense, including tax fraud, which presumably doesn't make somebody particularly violently dangerous. That's correct. There is no finding of dangerousness in this particular case or required by the statute. But we don't believe that that is a requirement. Again, returning to the history, as this Court said on Bonk v. Tyler v. Hillsdale County, part of the original meaning of the Second Amendment is the ability of legislatures to make categorical judgments and categorical predictions about dangerousness. And I think it's just common sense that someone who is under indictment is likely to present a greater risk of danger than an ordinary citizen. It's a very volatile period after someone has been indicted, even for a crime that might not seem to be violent. After you've been indicted for serious tax fraud, that's not the best time for you to go out and amass an arsenal. I think that's the rational understanding that's reflected both in the history and in the substance of 922N. Let me ask you another, and I don't want to dominate here, but let me just ask you one question. Tyler is pre-Bruin, correct? Tyler is our case. Tyler definitely says that Congress can make categorical judgments. Do you think anything about Bruin calls that into question, or are we still bound by that part of Tyler? We believe that the Court is still bound by that part of Tyler and that it remains good law post-Bruin. Bruin, of course, criticized the second step, the tiers of scrutiny approach that courts of appeals had applied post-Heller, but the portion of Tyler that I'm referring to wasn't in that discussion. It was instead talking about background principles of Second Amendment law, and I think that principle appears in Bruin and Heller as well. The Court refers to categories like felons, like the mentally ill, groups that have long historically and categorically been excluded from the scope of the Second Amendment. So we think that that trend appears strongly in the history and also is recognized in the Supreme Court's more recent cases on this issue. If I could just briefly address the presumption of innocence, of course the presumption of innocence is an important principle, but as the Supreme Court explained in Bell v. Woolfish, it is really just a shorthand for the idea that the government bears the burden of proof at trial. We bore that burden. We proved that burden at the trial of Mr. Gore. The presumption of innocence has never meant that someone who is indicted for serious crimes cannot be subject to deprivations of their liberties or that they are similarly situated in all respects to someone who is not under indictment. That's why cases like Bell and Salerno allow a range of restrictions on the rights of individuals who have been indicted, and we think that the restriction imposed by 922N, prohibiting them from purchasing new firearms, is consistent with those sorts of restrictions. What role do you think Rahimi will play in this? I think it's likely that Rahimi is going to clarify both steps of the Bruin analysis. I think it's likely that Rahimi will say something about how, if at all, dangerousness and the categorical approach factors in at both steps of the analysis. Rahimi is also likely to explore more in depth some of the historical analogies that we have relied on. In this case, like the surety laws, those are also laws the government has relied on in Rahimi. I certainly would encourage the court to wait until Rahimi is decided in order to decide this case, and we would be happy to submit supplemental briefing once Rahimi is decided, if the court would like that. I think we probably would. I fear that in 20 minutes we're going to get a decision in Rahimi. That is my fear as well, Your Honor. It's likely to come out soon, and I do think it's likely to bear on the issues in this case. If there are no further questions, we'd ask that the court affirm. No further questions then. Thank you. Your Honor, the first thing I'd like to address is the Batson issue. In my brief, I did argue Chinchilla. Chinchilla is a Ninth Circuit case, it's in document 22, page 18, where the Ninth Circuit decided the record did not support the prosecutor's explanation of the reasons why he chose to strike the person. So I think that might be something I didn't point out before. I'd also like to follow up and talk about this fact. Felon dispossession laws didn't really come around until the 1930s in the United States. Yeah, you're dispossessed while you're doing your sentence. You get out, you can go buy whatever you want, you can rearm yourself, you're fine. That's the historical aspect here. It's not until the Gun Control Act of the 30s where all this stuff got dumped in federally. Machine guns, Ohio adopted the machine gun things at the same time. Everybody did, because of the bank robbers. And that's what happened. So the felon dispossession laws, like 922G, really don't have a historical background in the 1700s when the Second Amendment was adopted. The only thing you really had dispossession-wise was, wait a minute. Right, but you don't even have a dispossession. In 922N, the government is saying, ah, if you've been indicted, this may not be a particularly good time to let you go acquire new weapons. Why do you want to get new weapons now? You can keep the old weapons you had, but if you're going to buy your arsenal now, that might suggest you're likely to flee, you're likely to bump off a witness. Can I briefly address that, Your Honor? I see this happen all the time in Columbus, Ohio, and this is what goes on. There's a murder, there's kids out buying and selling guns, and all of a sudden there's a shooting and somebody dies. What's the next step? Retaliation by the family members. If you're under indictment, you better have a gun, because guess what, they're coming for you. And they're coming hard, because there's so much retaliation on the street, it's really scary up there. It's scary here in Cincinnati, I know it's scary in Dayton, it's going on everywhere. I'd prefer to have a gun for my protection if I was in that situation, because they're coming. You know what's even sadder? The minute the family goes to the funeral for the person who was killed, the people are coming in and robbing their house, and they're stealing everything they've got, because they know nobody's home. That's how sad it is. We would ask the court to consider the Batson issue, decide that in Mr. Gore's favor. We wish the court would decide the 922N issue in his favor. I did make an argument in my brief about the stolen firearm thing, because I'm not sure whether it's a lifetime dispossession thing, unless the gun is always of the status of being a stolen firearm. We notice that you are doing this case as a CJA appointed attorney, and we want to thank you for your willingness to work with the justice system by having attorneys come and appear on behalf of defendants. It enables our system to function, so thank you for participating in that. Thank you, Your Honor. If there's nothing further on this case, it will be taken under advisement and an opinion issued in due course. You may call the next case.